UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOONBEAM CAPITAL
INVESTMENTS, LLC, and
TRAVELERS INDEMNITY
COMPANY,

          Plaintiffs,

v.

INTEGRATED
CONSTRUCTION SOLUTIONS,
INC.,

          Defendant.

_____/

Case No. 2:18-cv-12606
District Judge Gershwin A. Drain
Magistrate Judge Anthony P. Patti

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE THE OPINION AND EVIDENCE OF DEFENDANT'S EXPERT GEORGE WHARTON (ECF No. 53)

### I.    Introduction

On August 21, 2018, Plaintiffs Moonbeam Capital Investments, LLC and

The Travelers Indemnity Company (together, "Plaintiffs") filed the instant

negligence and contractual indemnity claims against Defendant Integrated

Construction Solutions, Inc. ("Defendant"). (ECF No. 1.) Plaintiffs purport that

severe water damage resulted from Defendant's negligent actions in installing a

mirror at the Farmington Hills Radisson Hotel. ( ECF No. 1, PageID.5-7.)

Presently before the Court is Plaintiffs' motion to exclude the opinion and demonstrative evidence of Defendant's expert George Wharton, filed on October 24, 2019. (ECF No. 53.) Defendant filed a response on November 7, 2019. (ECF No. 54.) Plaintiffs filed their reply on November 14, 2019. (ECF No. 57.) The parties filed a joint list of unresolved issues on December 9, 2019. (ECF No. 72.) A hearing was held on January 18, 2020, at the conclusion of which the Court took the matter under advisement. For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiffs' Motion. (ECF No. 53.)

## II. Factual Background

### A. Underlying events

#### 1. The incident

As the Court previously summarized (*see* ECF No. 82, PageID.4485-4486), Plaintiffs' claims stem from an accident at the Radisson Hotel on February 16, 2017. (ECF No. 1, PageID.3.) On that date, a mirror in the bathroom of Room 239 fell and landed on a capped water line. (ECF No. 66, PageID.3836.) This accident allegedly caused "severe water damage throughout the hotel," including personal property and business income losses. (ECF No. 1, PageID.4.)

Prior to the accident, Plaintiff Moonbeam Capital Investments, LLC—the hotel owner—undertook a remodeling project and therefore hired Defendant to perform construction services, including renovating bathrooms. (ECF No. 1,

2

PageID.3.)  The project required that certain mirrors be removed and then put back in place once the bathrooms were appropriately remodeled.  (ECF No. 60, PageID.3200.)  Plaintiffs allege that Defendant was negligent in using a damaged cleat to install the mirror in question; failing to properly seat the mirror on the cleat; failing to allow adequate clearance between the lighting fixtures and the mirror; and failing to properly inspect the work performed to ensure that the mirror was properly seated to prevent it from falling over the exposed water line, amongst other things.  (ECF No. 1, PageID.5–7.)

## 2.  Defendant's immediate post-incident investigation

As the Court has previously recounted:

> Pete Hanewich, Defendant's president, inspected the wall cleat in Room 239's bathroom on the morning of loss.  ECF No. 42, PageID.1129.  He noted that the cleat was "perfectly intact" and that there was "no damage to the cleat on the mirror."  ECF No. 42-4, PageID.1187.  Mr. Hanewich later saw the mirror in hotel manager Mr. Gary Sabbagh's office.  ECF No. 42, PageID.1130.  On the afternoon of the alleged accident, the mirror was purportedly moved to Mr. Sabbagh's office.  *Id.*; ECF No. 47, PageID.1502.

> Defendant's insurer Amerisure hired an independent adjuster, John Burke, to inspect and photograph Room 239 and the mirror.  ECF No. 47, PageID.1502.  Mr. Burke testified that he inspected a mirror; measured the cleats; and measured a mirror in Mr. Sabbagh's office on the day of the alleged accident.  ECF No. 70-3, PageID.3961–62.  He also took multiple photos of Room 239 and its bathroom.  *See* ECF No. 70-4 (photo sheet indicates that the photos were taken on February 17, 2017).  In his deposition, Mr. Burke indicated that he went into Room 239's bathroom before preparing his report on the cleat system.  ECF No. 70-3, PageID.3962.

Defendant also retained investigator Paul Izzo. ECF No. 100, PageID.5404.  Mr. Izzo inspected Room 239, the mirror, and the cleats on February 28, 2017.  ECF No. 100, PageID.5404.  He denoted that the cleats showed "no evidence of damage or distress."  ECF No. 70-5, PageID.4014.  After the completion of these inspections, as well as Plaintiff Travelers' inspection, the mirror was moved to an evidence storage unit in Connecticut.  ECF No. 100, PageID.5404; *see also* ECF No. 70-7.

(ECF No. 103, PageID.5440-5441.)

## B. Timeline of key events in the litigation

The Court takes note of the following events that occurred during the course of the lawsuit pertinent to this motion:

- November 7, 2018:  Scheduling order issued, setting expert disclosure and rebuttal deadlines of May 27, 2019, and June 27, 2019, with all discovery to close on August 2, 2019 (ECF No. 12.)

- February 27, 2019:  Order denying Defendant's motion to compel production of the mirror and cleat at the loss location (ECF No. 25.)

- May 24-28, 2019:  Expert reports were exchanged by both sides

- June 25, 2019: Defense expert (George Wharton) rebuttal report issued

- June 26, 2019: Court overrules objections to order denying Defendant's motion to compel production of the mirror and cleat at the loss location (ECF No. 41.)

- August 2, 2019:  Discovery deadline

- September 17, 2019:  Plaintiffs' expert (Brian Tognetti) deposed (timing by mutual agreement)

- **September 20, 2019**:  Defendant's expert (Wharton) deposed (timing by mutual agreement) and model/exemplar/mockup is first produced during his deposition (manufactured the evening before)

## C.  The expert reports

### 1.  Tognetti (Plaintiffs)

As described in the Court's order of December 30, 2019, Plaintiffs retained Brian Tognetti "to conduct an inspection and render professional opinions on the cause of the water damage in the instant matter.  Tognetti is a licensed architect, who hold a master's degree in that discipline.  (ECF No. 53-13, PageID.2251.)  He prepared an Expert Report on May 28, 2019." (ECF No. 82, PageID.4486) (internal citations omitted).  Without again recounting all of the investigation undertaken by Tognetti, the Court reiterates its summary of his opinions:

> Mr. Tognetti's Expert Report included four statements of opinion as well as eight photographs demonstrating his assessment and a hand drawn diagram.  *See id.* at PageID.2261–69.  Mr. Tognetti opined that the evidence he observed indicates the fallen mirror's sudden striking of the water line caused the rupture and subsequent damage.  *Id.* at PageID.2261.  Further, he explained that it was "physically impossible" for the mirror's cleat system to have been properly installed.  *Id.*  He asserted that Defendant's installation was not in compliance with the minimum requirements of the 2015 MRCEB.  *Id.*  Finally, Mr. Tognetti concluded that the "unstable mirror condition created by [Defendant] was susceptible to detachment or dislodgement from vibration induced movement to the wall assembly . . . ."  *Id.*

(ECF No. 82, PageID.4487).

### 2.  Wharton (Defendant)

Defendant retained George Wharton, P.E., a senior mechanical engineer with a long list of professional societies and education, as its expert. (*See* Curriculum Vitae, ECF No. 53-16, PageID.2279.) He issued an initial report and a rebuttal report.

### a. Initial report of May 24, 2019

As explained in his initial report, the stated purpose of his investigation "was to determine the cause of the water intrusion." (ECF No. 53-16, PageId.2273.) Early on, he notes that he "has not been provided the opportunity to inspect the subject hotel room or the mirror that was reportedly found sitting on the water line and drain connections." (ECF No. 53-16, PageID.2273.) Just before summarizing his opinions, he states that, "Reconstruction of this accident and determination of causation and responsibility are premature without the opportunity to examine the mirror that was reportedly recovered and inspect the subject hotel room and without the benefit of deposition testimony." (ECF No. 53-16, PageID.2276.) His "Summary of Opinion" states:

> The following opinions are stated within a reasonable degree of engineering certainty.
>
> 1. The information provided to date has provided conflicting information about the condition of the bathroom and especially the mirror when the water leak was discovered.
>
> 2. Review of the witness testimony and examination of the mirror and of the subject bathroom will be required to attempt to resolve the

conflicting information, to recreate the incident and to determine the cause of this loss.

(ECF No. 53-16, PageID.2276.)

## b. Rebuttal report of June 25, 2019

Wharton's rebuttal report, issued after reviewing Plaintiffs' expert report, again protested that he "still ha[d] not been provided the opportunity to inspect the subject hotel room or the mirror that was reportedly found sitting on the water line and drain connections." *(*ECF No. 53-16, PageID.2283.) The Court makes the following observations pertinent to Wharton's report. First, he acknowledges that, "Mr. Tognetti provided a hypothesis for the cause of the fallen mirror based on his *review of the photographs* and his inspection of the current condition of the bathroom in Room 239 and other exemplar rooms. Mr. Tognetti had not inspected the mirror currently stored at the Travelers Lab." (ECF No. 53-16, PageID.2286 (emphasis added).) Second, he notes that, "Mr. Tognetti calculated an overlap of ¼ inch between the ends of the cleats and observed that the overlap needed to be 'overcome' to install the mirror." (ECF No. 53-16, PageID.2286.) Third, he states that, "Mr. Tognetti did not describe how the overlap between the ends of the cleats could have been overcome to install the mirror. Mr. Tognetti's hypothesis is based on his assumption that the light fixture was installed before the mirror, which is contradicted by the testimony of Mr. Wilson, who installed the mirror." (ECF No. 53-16, PageID.2286.) Then, notwithstanding the Court's

previous rejection of his request (ECF No. 25) and the causation opinions already rendered by Plaintiffs' expert, he insists that, "Forensic reconstruction of this accident and determination of causation and responsibility still requires that the mirror and cleats stored at the Travelers Lab be returned to Room 239 and that the specific spatial relationships of the light fixture, the mirror and the cleats be carefully examined and measured." (ECF No. 53-16, PageID.2286.) His "Summary of Opinion" states:

> The following additional opinions are stated within a reasonable degree of engineering certainty.
>
> 1. There is still no explanation for the sudden appearance of furniture in Room 239 on the morning when the piping leak was discovered.
>
> 2. There is still no explanation for the vanity seen outside Room 239 on the morning when the piping leak was discovered.
>
> 3. Checking Mr. Tognetti's hypothesis for the mechanism of the mirror falling on the piping will require a careful inspection of the subject mirror and cleats, and the current conditions in Room 239.

(ECF 53-16, PageID.2287.)

### D. The expert depositions

#### 1. Tognetti is deposed (September 17, 2019)

##### a. "Impossibility"

In its present motion, Defendant makes much of Tognetti having supposedly revealed a "new" opinion regarding the *impossibility* of the mirror being installed before the light fixture and of the fact that Tognetti took measurements of the

actual mirror at Traveler's Lab in Connecticut in the interval between his report and deposition. Actually, the transcript reveals that Tognetti was extremely cautious about emphatically concluding that a sequence in which the mirror was installed before the light fixture is not possible. Instead, he indicated that such a scenario "would be contrary to what I am concluding from the physical evidence relative to the sequence of events." (ECF No. 54-21, PageID.2638.) When pressed to say that it would be "impossible," he again clarified, "It would make that scenario much more *unlikely, but I'm hesitant to say it's wrong* because you could still *hypothetically* have someone install the mirror improperly so it's not nested and seated and then sequentially install the light fixture, somehow getting the screws in, and *the end result is essentially the same thing that occurred in the opposite sequence, a mirror that's not properly installed*." (ECF No. 54-21, PageID.2638 (emphases added.)) In fact, while testifying that "I highly doubt" there would be enough room to mount the mirror after the light fixture had been installed, he was pressed further by defense counsel and gave the following testimony, in pertinent part:

Q: So you're saying it's impossible or not?

A: I don't know a way to do that.

* * *

Q: Are you saying that a tradesman couldn't do that?

A: I don't believe a tradesman could place this screw that I saw *with the size head that it had in that dimension, that criteria*, install the screw. I believe *that's* physically impossible.

(ECF 54-21, PageID.2639 (emphases added).)

### b. Mirror inspection in Connecticut

Tognetti inspected the mirror at the Traveler's Lab on July 10, 2019. He took some notes and photographs while there. (Tognetti Dep. Trans., ECF No. 54-21, p. 10, PageID.2624.) Based upon marks appearing on the top of the mirror in photographs, as confirmed during this inspection, he opined that "there's a reasonable degree of certainty that the indentations, the markings, the gouges on the top of the frame, as observed by me in the laboratory in Connecticut, were caused by screws being present in the bottom of the light fixture and the light fixture itself, the corner of the light fixture that existed at the time of the loss." (Tognetti Dep Trans., No. 54-21, p. 114, PageID.2650.) Tognetti clarified that while Burke's photographs showed the actual screws still present, his own later inspection and photos showed only the markings left by the screws. (Tognetti Dep. Trans., No. 54-21, p. 113, PageID.2649.) Significantly, the deposition transcript contains the following exchange:

Q. Did anything that you did in Connecticut or from the expert reports you reviewed from the defendants change any of your opinions?

A. No.

(Tognetti Dep. Trans., ECF No. 54-21, p.10, PageID.2624.)

10

## 2. Wharton is deposed and produces a mockup

### a. Questions about his prior reports

Wharton was deposed three days later, on September 20, 2019. He was initially asked about his written opinions, and confirmed that, although he was to "recreate the incident and…determine the cause of this loss" as well as attempt to "resolve the conflicting information[,]" he gave no opinion with regard to causation, but instead merely gave a recommendation of what he believes is *necessary to render* an opinion. (Wharton Dep. Trans. at 9, ECF 53-17, PageID.2303 (emphasis added).)

### b. Wharton's mockup

During the course of his deposition, Wharton for the first time revealed that although he had not "[c]heck[ed] Mr. Tognetti's hypothesis for the mechanism of the mirror falling on the piping[,]" he had "done some *testing* to look at Mr. Tognetti's hypothesis." (Wharton Dep. Trans., ECF No. 53-17, p. 16, PageID.2310.) "I tried to create a – the same geometry with a cleat and a mirror and a light to see, for example, his conclusion that you couldn't put the screws in if the mirror was up before the light, to see whether that had any validity." (Wharton Dep. Trans., ECF No. 53-17, p. 16, PageID.2310.) He then explained that, while neither the opinion nor this testing were contained anywhere in his written materials, he had only done his testing the night before the deposition, resulting in

a mockup "[o]ver there on the counter." (Wharton Dep. Trans., ECF No. 53-17, p. 17, PageID.2311.) The mockup was then apparently carried over to the vicinity of the court reporter and described on the record. (Wharton Dep. Trans., ECF No. 53-17, pp. 17-18, PageID.2312-2313.) In constructing the mockup, he relied upon "Mr. Tognetti's sketch that he provided during his deposition." (Wharton Dep. Trans., ECF No. 53-17, p. 19, PageID.2313.) More accurately, the Tognetti sketch, which is dated May 1, 2019, was provided with his original report, as previously acknowledged by this Court. (ECF No. 53-14, PageID.2269; ECF No. 82, PageID.4487 (citing PageID.2261–69.) In any case, Wharton acknowledged that his mockup was based upon "the dimension that Mr. Tognetti had in his drawings. And then the profile or the top of the mirror is the same he had in his drawings…." (Wharton Dep. Trans., ECF No. 53-17, p. 20, PageID.2314.) He later reiterated, "Well, they are based on Mr. Tognetti's measurements, so I'm confident that they represent those." (Wharton Dep. Trans., ECF No. 53-17, p. 25, PageID.2319.) Accordingly, he believes that the expert opinion he draws from the mockup, which resulted from his experiment, accurately represents the conditions in Room 239 when the mirror and the light fixture were installed. (Wharton Dep. Trans., ECF No. 53-17, p. 25, PageID.2319.) The opinion is: "It's similar enough for me to say within a reasonable degree of engineering certainty that Mr. Tognetti is wrong in saying that screws could not have been installed." (Wharton Dep.

Trans., ECF No. 53-17, p. 21, PageID.2315.) In other words, the model or mockup demonstrates that "[i]t is possible to put screws in the bottom of the light fixture with the mirror installed." (Wharton Dep. Trans., ECF No. 53-17, p. 26, PageID.2320.) Finally, when asked if he had any other opinions with regard to this incident, he concluded, "Just that Mr. Tognetti's whole theory was based on that observation, his conclusion that the light fixture had to be installed before the mirror, and that's speculation on his part. I mean, that's my opinion." (Wharton Dep. Trans., ECF No. 53-17, p. 27, PageID.2321.)

### c. Failure to inspect

Although in Wharton's first report he indicated that it would be necessary to inspect the bathroom and the mirror, he had not done so before rendering a written opinion and still had not done so by the time of his deposition. (Wharton Dep. Trans., ECF No. 53-17, p. 10, PageID.2304.) Notwithstanding Defendant's repeated claim that Plaintiffs unfairly prevented Wharton from inspecting the mirror and the cleats in Connecticut, the Court has previously documented the fact that *its other agents did*. Specifically:

> Mr. Burke testified that he inspected a mirror; measured the cleats; and measured a mirror in Mr. Sabbagh's office on February 17, 2017. ECF No. 70-3, PageID.3961–62. He also took multiple photos of Room 239 and its bathroom. *See* ECF No. 70-4. In his deposition, Mr. Burke also indicated that he went into Room 239's bathroom before preparing his report on the cleat system. ECF No. 70-3, PageID.3962. Additionally, the Court denotes that Mr. Izzo inspected

Room 239, its light fixture, and wall cleat on February 28, 2017. ECF
No. 70-5, PageID.4015. Like Mr. Burke, Mr. Izzo also took multiple
photos of the evidence. *See* ECF No. 70-6.

(ECF No. 103, PageID.5447-5448.)

The Court also denoted "that the evidence was moved after the initial

inspections by both Mr. Burke and Mr. Izzo." (*Id.*, PageID.5448.) And, this Court

has also acknowledged that:

Plaintiffs' counsel advised Defendant's counsel on June 27,
2019 that the evidence would be available for inspection in
Connecticut on July 10, 2019. ECF No. 67-2, PageID.3897.
Defendant's counsel rejected the proposed date and reiterated that he
and his client desired to inspect Room 239. *Id.* at PageID.3896.
Plaintiffs' counsel responded to this request an hour later, stating that
her clients could arrange an inspection of Room 239 once he
submitted a protocol and proposed dates. *Id.*"

(ECF No. 103, PageID.5443.)

Finally, Wharton himself was asked point-blank, "Is there any reason why

you have not gone to Connecticut to inspect the mirror and the cleats?" and

answered "My client's direction." (Wharton Dep. Trans., ECF No. 53-17, pp.27-

28, PageID.2322.)[1]

---

[1] The motivation for giving such direction to its expert is unclear. It is possible
that Defendant or its insurance carrier did not want to spend the money, rather than
a more nefarious motive like trying to keep the ongoing argument about needing to
have the mirror inspected in the hotel room alive; however, the lack of a record on
this point renders it mere conjecture. It is further noted that in their reply brief
Plaintiffs inaccurately characterize this testimony as also applying to Wharton's
failure to *inspect the hotel room*, but defense counsel's repeated speaking

## III. Discussion

Plaintiffs object to the late production of Wharton's mockup at his deposition, more than two months after the expert disclosure deadline. Asserting that the untimely disclosure caused prejudice, they seek to have the mockup, and Wharton's corresponding testimony that it would have been possible to hang the light fixture after the mirror had been installed, excluded from the evidence to be presented at trial. (ECF No. 53, PageID.2115-2116, 2128-2141.) Additionally, Plaintiffs request that the Court exclude from evidence the remainder of Wharton's opinion and strike him as an expert entirely "because his initial disclosure and rebuttal report do not satisfy Fed. R. Civ. P. 26(a)(2)(B)." (ECF No. 53, PageID.2116, ¶ 9) (capitalization in citation corrected.)

Defendant responds by asserting that Wharton's mockup and opinion regarding impossibility should be permitted because they were offered in response to an opinion by Tognetti disclosed for the first time at his deposition, three days before Wharton was deposed. Specifically, Defendant repeatedly argues that its late disclosure was substantially justified because "Tognetti's claim that the screws

---

objections attempting to supply his own snarky answer to that specific question kept the witness from actually answering *that* query, ostensibly in violation of Fed. R. Civ. P. 30(c)(2)'s prohibition against argumentative and suggestive objections. (ECF 57, PageID.2707-2708; ECF 53-17, PageID.2321-2322.) The Court does not appreciate either side's efforts with respect to making an accurate record on this particular question.

holding the light fixture to the wall could not be installed after the mirror was installed" was "new information," a "new investigation" and a "new opinion" that was "expressed by Tognetti for the first time at his deposition [, namely,] that it was impossible to screw the screws into the bottom of the light fixture if the mirror was in place first." (ECF No. 54, PageID.2364, 371, 2378-2379; *see also* ECF No. 54, PageID.2357, 2372-2374.) Further, Defendant asserts that: (1) Wharton could not have provided his opinion on the sequence of events earlier because he was denied access to both the mirror and the hotel room; (2) the late disclosure was harmless in any case; and (3) Wharton should not be excluded as an expert entirely because a defense expert may rebut the opinion of a plaintiff's expert, without necessarily propounding his own original theory.[2] (ECF No. 54, PageID.2363-2365, 2379-2386.)

### A. Legal standards

As correctly framed by the parties, the two Federal Rules of Civil Procedure at issue here are Rules 26 and 37. Under Rule 26(a), an expert witness disclosure must be accompanied by a written report which contains, in pertinent part, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). These expert disclosures must be

---

[2] This third argument was also emphasized by defense counsel at oral argument.

made at the times and in the sequence the court orders, but absent a stipulation or court order, "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D)(ii). Further, a party who has made a disclosure under Rule 26(a) must supplement or correct its disclosure or response. Fed. R. Civ. P. 26(e)(1). "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2).

Rule 37(c) describes the sanctions a court may impose for any failure to disclose or supplement. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In addition to or instead of the above sanction, the court may order the payment of reasonable expenses caused by the failure, inform the jury of the party's failure, and/or impose other appropriate sanctions. Fed. R. Civ. P. 37(c)(1)(A)-(C).

The expert disclosure deadlines established by the default provisions of Rule 26(a)(2)(D) or by the specific schedule implemented in an individual case, as here, seek to ensure the orderly progression of pretrial discovery and to avoid surprise and undue prejudice.

> A party may not use a supplemental report to disclose information that should have been disclosed in the initial expert report, thereby circumventing the requirement for a timely and complete expert witness report. Accordingly, a supplemental report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c).

*Moore's Federal Practice* 3d, § 26.131[2]. *See also Bean v. Meridian L.L.C. v. Suzuki Motor Co.* (*In re C.F. Bean L.L.C.*), 841 F.3d 365, 371-72 (5th Cir. 2016) (disclosures must be "supplemental" and should not add new information or expand expert analysis and opinions). And Rule 37(c) establishes sanctions for untimely disclosures in order:

> to provide parties with an incentive to timely disclose all material evidence in support of their positions that they intend to use at any point during the course of the litigation, thus attacking the temptation some parties might feel to try to gain a tactical advantage at trial by exposing for the first time at that stage evidence that is favorable to their position.
>
> To trigger this automatic exclusion sanction, a party must seek to use at trial or *in connection with a motion* evidence that it failed to disclose.

*Moore's, supra.*, § 37.60[1] (emphasis added). *See also In re Timi Litig. Cases Consol.*, 911 F. Supp. 775, 816 (M.D. Pa 1996) (Fed. R. Civ. P. 26(a)(2)(B) is

ordinarily violated when a complete statement of expert witness opinions was not provided); *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995) (holding that the district court did not abuse its discretion in limiting the testimony of the plaintiff's expert witness based on failure to comply with the discovery order regarding expert disclosures).

In the instant matter, soon after the first revelation of Wharton's mockup and his new opinion regarding the sequence of installation and possibility of the mirror having been installed first (September 20, 2019), Defendant used that opinion, in the form of an affidavit, as an exhibit attached to the October 3, 2019 reply brief *in support of its motion* for summary judgment. (ECF No. 51-2, PageID.2064-2066.) And it is clear that Defendant will also seek to introduce the opinion and mockup at trial. Thus, unless Defendant can show that its violation of Rule 26(a) was either justified or harmless, the preclusion sanction is automatic and mandatory. *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (internal citations omitted). The Sixth Circuit "agree[s] with the circuits that have put the

burden on the potentially sanctioned party to prove harmlessness." *Id*. (citing *Salgado*, 150 F.3d at 741-42).

In the case at bar, Defendant asks the Court to follow the Sixth Circuit's opinion in *Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015), applying the five factors for determining substantial justification and harmlessness previously enunciated by the Fourth Circuit in *Russell v. Absolute Collections Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014). In *Howe*, a case which is distinguishable in that it involved the failure to make *initial* disclosures, rather than *expert* disclosures, the Court started from the premise that under Rule 37(c)(1), "exclusion of late or undisclosed evidence is the usual remedy for noncompliance with Rule 26(a) or (e) . . . ." *Howe*, 801 F.3d at 747. The Court then considered the situations in which a trial court might order alternative sanctions "'instead of' exclusion of the late or undisclosed evidence" pursuant to the language of the Rule. *Id*. After examining the Advisory Committee Notes to the 1993 Amendments, which provide several inapplicable examples of situations exempt from the harsher penalties – such as the failure to disclose witnesses already listed by other parties and mistakes by *pro se* litigants – the Court observed that the "Advisory Committee Notes . . . strongly suggest[] that 'harmless' involves an honest mistake on the part of the party coupled with sufficient knowledge on the part of the other party." *Id*.

Thereafter, the Court adopted the five-factor *Russell* test, which assesses "a party's omitted or late disclosure" and determines whether it is substantially justified or harmless by considering:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe*, 801 F.3d at 748 (citing *Russell*, 763 F.3d at 396-97). That analysis, of course, rests upon the specific facts of the individual case.

## B. Analysis

I will separately address the assertions Defendant makes in support of its argument that Wharton's mockup and impossibility opinion should not be excluded from evidence, the five-factor test adopted in *Howe*, and Plaintiffs' request that the Court completely strike Wharton as an expert witness.

### 1. Whether the mockup and "impossibility" opinion were given to rebut an opinion first revealed at Tognetti's deposition

Defendant asserts that Wharton's tardy opinion that it was indeed possible for the mirror to have been properly installed or engaged in advance of the light fixture should be permitted because it was offered to rebut the opinion Tognetti revealed for the first time during his September 2019 deposition that the mirror could not have been installed after the light fixture due to a lack of space for

installing the screws necessary to secure the light fixture.  According to Defendant,

"[t]his was not in [Tognetti's] report."  (ECF No. 54, PageID.2371.)  However,

Tognetti included this very opinion in his June 2019 report.  As previously

acknowledged by this Court, Tognetti's report "explained that it was 'physically

impossible' for the mirror's cleat system to have been properly installed."  (ECF

No. 82, PageID.4487.)  Specifically, the report states:

> The evidence within the provided photographs indicate it was
> *physically impossible* for the mirror's cleat system to have been
> properly installed (fully engaged) since: 1) the light fixture was
> installed *prior to the mirror being installed* based on the presence of
> the screws on the bottom of the light fixture, 2) the mirror fell yet the
> cleats, cleat anchors and subtrates remained intact, and 3) an
> additionally 1/4 inch of clearance, at minimum, would have been
> needed beneath the light fixture screws in order to maneuver the
> mirror cleat over the top of the wall cleat along the length of the light
> fixture.

(ECF No. 53-14, PageID.2261 (emphasis added).)  Further, Tognetti's report

included a hand-drawn diagram (ECF No. 53-14, PageID.2269; ECF No. 82,

PageID.4487) and, as Plaintiffs correctly note in their reply brief:

> [T]his diagram is based on measurements of the as-installed light
> fixture and wall cleat.  It depicts that it was not possible for the screws
> in the light fixture to be installed with the mirror on the wall.
> Conversely, it was not possible to interlock the clear hanging system
> with the screws in the bottom of the light fixture.  Contrary to
> defendant's argument[,] Tognetti's deposition did not reveal any new
> opinions.

(ECF No. 57, PageID.2705.)  Notably, the diagram is dated May 1, 2019.

Nevertheless, Defendant insists it was caught by surprise, noting that "Tognetti also admitted at his deposition that, if the mirror was hung first, this would be contrary to his conclusion, his opinion would have to be changed, and his opinion would be much more unlikely."  (ECF No. 54, PageID.2371, citing pp. 67-68, 108-112 of Tognetti's Dep. Trans.)  But after reviewing this deposition testimony, the Court is unconvinced by Defendant's assertion.  The testimony in question reads, in pertinent part, as follows:

> Q. Would you agree with me that if the mirror was installed, say installed -- assuming the mirror was installed, say my question installed before the light fixture, then that would be contrary to the basis of your opinion, wouldn't it?
>
> A. Yes, that would be contrary to what I am concluding from the physical evidence relative to the sequence of events.
>
> Q. And if the mirror was installed first, then your opinion would have to be changed, wouldn't it?
>
> A. Yes, but there would be other physical evidence, which doesn't make any more sense, so that's a hypothetical that doesn't make sense to me.
>
> Q. Okay.  But just for the sake of my question, assuming the mirror was installed first, then your opinion would be wrong.
>
> A. Which opinion are you referring to?
>
> Q. Saying that the whole scenario, that how the -- somehow the mirror was pinched between the light fixture and the right wall cleat.
>
> A. It would make that scenario much more unlikely, but I'm hesitant to say it's wrong because you could still hypothetically have someone install the mirror improperly so it's not nested and seated and then

23

> sequentially install the light fixture, somehow getting the screws in, and the end result is essentially the same thing that occurred in the opposite sequence, a mirror that's not properly installed.

(Tognetti Dep. Trans., pp. 67-68, ECF No. 54-21, PageID.2638-2639.)  Tognetti simply responded to a hypothetical (with which he disagreed), posed by defense counsel, but did not reveal a new opinion or substantially alter his original opinion. This was made clear by his testimony just a few pages later:

> Q. And do you know if that's enough room for someone to put a screw in there?
>
> A. No, I highly doubt that that's enough room, for anyone to put a screw in let alone tighten a screw.
>
> Q. So you're saying it's impossible or not?
>
> A. I don't know a way to do that.
>
>                 * * *
>
> Q. Are you saying that a tradesman couldn't do that?
>
> A. I don't believe a tradesman could place this screw that I saw with the size head that it had in that dimension, that criteria, install that screw.  I believe that's physically impossible.

(Dep. Trans., pp 71-72, ECF No. 54-21, PageID.2639.)

And it is also clear from the following colloquy that Defendant was well aware that Tognetti held this opinion from the report itself, which had been produced three months earlier:

> Q. Your opinion in your report that the reason the mirror fell was because it was installed improperly, in your scenario that it's pinched

between the light fixture and the -- and how the right-sided cleat then became deformed serves as the basis for your opinion that that's how it was installed.

A. I believe the answer is yes, that the mirror fell because it's improperly installed.

* * *

Q. On the one hand we have ICS who says we installed it and we installed the mirror before the light fixture. Okay. We have your opinion that, no, that's not what happened, the light fixture was installed first and then the mirror was installed and it was jammed between the light fixture and the right-sided deformed cleat.

A. Correct.

Q. So your opinion that the mirror was installed improperly is based upon your opinion that the mirror was installed improperly based on that scenario, correct?

A. The mirror was installed improperly, that's correct.

(Tognetti Dep. Trans., pp 108-109, ECF No. 54-2, PageID.2648-2649.) Defendant seems more impressed by its counsel's questions than by the actual testimony given by the witness. To claim that this testimony represents a substantive change from the opinion given in Tognetti's May report, or as previously described by this Court, is at best disingenuous and at worst a gross misstatement of the record. Thus, it cannot properly provide a basis for permitting new opinions by Wharton.

## 2. Whether Tognetti's post-report inspection changed Tognetti's opinion

Defendant also makes much of the fact that Tognetti flew to Connecticut and inspected the mirror at the Travelers Lab on July 10, 2019, after his report was

issued but prior to his deposition.  Defendant represents, without explaining how, that this inspection resulted in "multiple new opinions not included in the expert disclosure as part of a strategy by plaintiffs to prejudice defendant."  (ECF No. 54, PageID.2358, ¶ 6.)  But this ignores Tognetti's testimony regarding his visit to Connecticut.  When asked if "anything that you did in Connecticut or from the expert reports you reviewed from the defendants" changed his opinions, Tognetti said, unequivocally, "No."  (Dep. Trans., p. 10, ECF No. 54-21, PageID.2624.)

Although Tognetti took some notes at his July inspection in Connecticut (Dep. Trans., p. 34, ECF No. 54-21, PageID.2630.), the record is clear that, as part of his *original* report, Tognetti considered the photographs taken by John Burke in February 2017.  And, his original report included a diagram or sketch, and all the opinions contained in his written disclosures, well before going to Travelers Lab.  When asked again by defense counsel, he confirmed this:

> No, nothing changes anything. The markings that we were talking about in the photographs, the dimensional information, the damage to the mirror frame, it just verified the information that I had already seen in the prior photographs.

(Dep. Trans., p. 35, ECF No. 54-21, PageID.2630.)  As Tognetti explained:

> I can confirm that the mirror that I saw in Travelers' laboratory is, in fact, the mirror photographed by John Burke on February 17th, 2017, based on the physical evidence of the markings on the mirror, the measurements I took of the plumbing protrusions, the alignment of that.

(Dep. Trans., p. 95, ECF No. 54-21, PageID.2645.) When further pressed, he

made it clear that the mirror he saw in person in Connecticut was the same mirror

depicted in the Burke photographs he relied on in his report:

> Q. Because you say, you mentioned that the mirror you looked at in
> Connecticut is the mirror that Burke photographed on 2-17, but that's
> not necessarily the mirror that was in the bathroom on 2-16 at 6:00 or
> 7:00 a.m., correct?
>
> A. Well, that's where I would disagree with that. And the reason is,
> that photographs that are provided around 7:00 a.m. on 2-16-17,
> which are figures one, particularly figure one, shows markings,
> distress on the frame, and you can see that distress, you can see that
> type of distress on Burke's photographs on 2-17 and then you can
> further see that same distress on July 10th of 2019 when I was at the
> lab.

(Tognetti Dep. Trans., pp. 97-98, ECF No. 54-21, PageID.2646.) In other words,

the trip to Connecticut did not change Tognetti's opinions; it *confirmed* them. As

such, it does not excuse Wharton's belated opinion and mockup. And, as

explained below, Wharton himself could have attended the July inspection at

Traveler's Lab in Connecticut and sought to confirm the same information first

hand.

### 3. Whether Wharton was prevented from disclosing his mockup and opinion earlier because of being denied access to the mirror and hotel room

Finally, Defendant claims Wharton's late opinion and mockup should be

excused because he "has been denied any access to Room 239 with or without the

allegedly-involved mirror," and because "Plaintiffs have refused to allow the

inspection of the mirror in the bathroom of Room 239 *or even an inspection of Room 239 without the allegedly-involved mirror*." (ECF No. 54, PageID.2369-2370 (emphasis added).) But as Defendant has known since February 27, 2019, Plaintiffs were not required to produce the mirror for inspection "in the bathroom of Room 239" because the Court denied that very request. (ECF No. 25.) Nevertheless, despite my ruling and Judge Drain's June 26, 2019 affirmance (ECF No. 41), Defendant has continued to complain about its inability to inspect the mirror in the bathroom, without availing itself of the opportunity to inspect either the bathroom or the mirror separately, waiting until 3 ½ months after the close of discovery to ask the Court for access to the bathroom. (ECF No. 59.) In denying that motion, I found, *inter alia*, that "Defendant had multiple opportunities to conduct the proposed inspection well before expert reports were due or discovery had closed." (ECF No. 89, PageID.5195, citing ECF No. 67-2, pageID.3892, 3896.) These opportunities were pointed out in Judge Drain's recent opinion and order denying Defendant's motion to extend discovery, wherein he found that Defendant was "not diligent over its ten months of discovery." (ECF No. 103, PageID.5442-5443, 5450.)[3]

---

[3] In fact, the record shows that the real issue was not over whether Defendant would be *permitted to inspect* the bathroom, but rather, whether it would be permitted to undertake *destructive testing* in the bathroom. (ECF No. 67-2, PageID.3892-3897.)

Likewise, despite Defendant's unsupported accusations, it was free to inspect the mirror and cleat in Connecticut, but failed to do so. Notably, it did not seek to compel Plaintiffs to make the mirror and cleat available at the Travelers Lab. It had no reason to do so, because back in February 2019, the Court had already noted "Plaintiffs thus have agreed to make the mirror and wall cleat available for inspection, as requested, where they have been stored in the ordinary course of business since March 2017." (ECF No. 25, PageID.627; *see also* ECF No. 103, PageID.5441-5442.).) Further, at his deposition, Wharton indicated why he never traveled to Connecticut to inspect the mirror and cleat: "My client's direction." (Dep. Trans., pp. 27-28, ECF No. 53-17, PageID.2322.) Judge Drain recently took notice of this same admission. (ECF No. 103, PageID.5449.)

In the end, this issue is a red herring. Neither expert apparently needed to see the mirror and cleat in person. Tognetti clearly did not, as he issued his report well in advance of his one and only trip to Connecticut and then testified that it did not change his conclusions. (Tognetti Dep. Trans., p. 10, ECF No. 54-21, PageID.2624.) Similarly, Wharton, when he finally got around to fabricating a mockup and rendering an opinion on available wall spacing and the sequence of possible events at his deposition in September 2019, did so without undertaking an inspection of the mirror, the cleat, or the hotel room.

**4. Whether Defendant's failure to disclose its expert's opinion in a timely fashion was substantially justified or harmless**

In determining whether, under Rule 37(c)(1), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial," the Court considers whether "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And, as discussed above, Defendant asks the Court to follow the Sixth Circuit's opinion in *Howe*, in which the Sixth Circuit adopted the following five factors "to assess whether a party's omitted or late disclosure is 'substantially justified' or 'harmless'":

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe*, 801 F.3d at 747-48. For the foregoing reasons, the Court finds that the factors weigh in Plaintiffs' favor, and Defendant's failure to timely disclose Wharton's impossibility opinion and mockup was neither substantially justified nor harmless.

First, the record demonstrates that the late disclosure of Wharton's impossibility opinion and mockup was a surprise to Plaintiffs. Again, neither Wharton's initial May 24, 2019 report, nor his June 25, 2019 rebuttal report, provided any opinion regarding the possibility of installing the mirror prior to the

light fixture.  (ECF No. 53-16.)  In fact, Wharton opined in both that reconstruction of the accident and the ability to examine the mirror and inspect the hotel room would be needed to determine causation and responsibility.  (ECF No. 53-16, PageID.2276, 2286.)  And when Wharton revealed the new opinion and mockup for the first time at his September 20, 2019 deposition (Wharton Dep. Trans., pp. 16-27, ECF No. 53-17, PageID.2310-2321), Plaintiffs' counsel was clearly surprised.  As she explained at the motion hearing, she was caught off guard at Wharton's deposition by the new opinion and mockup.  And the deposition transcript confirms her statements, revealing that after she was told that Wharton's mockup was "over there on the counter[,]" Plaintiffs' counsel stated, "I've never heard of this before, so let's bring it in."  She then thought aloud, "I guess I'm going to take some photographs of what this thing is."  (Wharton Dep. Trans., pp. 17-18, ECF No. 54-22, PageID.2657.)  The Court has no reason to doubt the authenticity of this seemingly spontaneous reaction, and Defendant offers none. Additionally, Plaintiffs' counsel further explained at oral argument that if she had known about and been able to see or examine Wharton's mockup before the deposition, and had been made aware of the conclusions he drew from it, she could have run all of this by her own expert, Tognetti, beforehand, been apprised of any weaknesses or inaccuracies in Wharton's work, and been properly prepared to cross-examine.  Instead, she was caught flat-footed and, therefore, prejudiced.  The

31

avoidance of this type of sandbagging is one of the very purposes of the expert disclosure rule.

The second factor – the ability of the party to cure the surprise – also favors Plaintiffs. It is true that, if the Court denies Plaintiffs' current motion and refuses to exclude Wharton's new opinion and mockup, Plaintiff's counsel would be able to prepare for and conduct cross-examination regarding both at trial. But the Court does not consider that an appropriate remedy. Instead, to adequately cure the surprise, Plaintiffs would have to be given the opportunity to re-depose Wharton regarding the mockup and his new opinion, after conferring with their own expert, Tognetti. This solution would, however, require the Court to re-open discovery, which closed on August 2, 2019, to schedule an additional deposition and to give Tognetti sufficient time to alter his own expert report and provide a rebuttal, if necessary. And considering that Defendant's expert had every opportunity to inspect the room and mirror prior to rendering his reports (and certainly before the close of discovery) and, therefore, create the mockup and render his opinion regarding impossibility, the Court is not inclined to grant any extensions. Moreover, such relief would contradict Judge Drain's most recent opinion and order denying Defendant's motion to extend discovery, which, in several places, notes how further discovery would "not only prejudice Plaintiffs but would also

disrupt the parties' commitment to good faith settlement discussions" at this advanced stage of the litigation. (ECF No. 103, PageID.5451.)

Next, the Court considers the extent to which allowing the evidence would disrupt trial. Although less so than the other factors, this too favors Plaintiffs. Re-opening discovery to cure any surprise could delay trial, currently set for May 19, 2020. (ECF No. 96.)

Fourth, the concept of impossibility is only quasi-important to this case. In their complaint, Plaintiffs claim contractual indemnity and negligence. (ECF No. 1, PageID.4-10.) With regard to negligence specifically, Plaintiffs allege, in part, that Defendant failed to properly install the subject mirror in accordance with applicable codes and regulations, failed to allow adequate clearance between the light fixtures and mirror to ensure the mirror was properly seated on the wall, and used damaged cleats to install the mirror, causing real and personal property damage. (ECF No. 1, PageID.4-7.) And both Tognetti and Wharton were retained to determine the cause of the water damage to the hotel. (Tognetti Report, ECF No. 53-14, PageID.2257; Wharton's Report and Rebuttal Report, ECF No. 53-16, PageID.2273, 2283.) Accordingly, impossibility – with respect to the sequence of what got hung first – is only tangentially important in relation to the most material issues of causation: clearance and proper hanging of the mirror. Factor four favors Plaintiffs.

Fifth, Defendant's proffered explanations, as described in detail above, fail to convince the Court that the late disclosure of Wharton's impossibility opinion was substantially justified or harmless. None of the multiple excuses Defendant gives for the late opinion and experimental mockup provided by its expert for the first time in his deposition, three months after his written report, are borne out by this record. Wharton had ample opportunity to inspect the mirror, cleat and hotel room, but for reasons known only to Defendant, was never given the green light to do so. Instead, Defendant repeatedly pushed to have the mirror returned to the hotel room – risking damage along the way – notwithstanding the Court's prior denial of that request, and inexplicably waited several months after the close of discovery to seek the Court's assistance in obtaining an inspection of the hotel room, despite Plaintiffs' demonstrable willingness to allow access, *sans* destructive testing. (ECF No. 67-2, PageID.3892-3897.) More importantly, Wharton was well aware of Tognetti's conclusions, as both experts issued their initial reports in late May of last year, and Wharton issued his rebuttal report at the end of June. Thus, there was no plausible reason for him to delay his revelation of a mockup or to withhold his opinion on the possibility of the mirror having been installed before the light fixture.

Furthermore, the delay was not harmless as a matter of law. As this Court noted in *Russel v. Bronson Heating & Cooling*, 345 F. Supp. 2d 761, 778 (E.D.

Mich. 2004), "[t]he Advisory Committee Notes to the 1993 Amendments (including Rule 37(c)(1)) strongly suggests that 'harmless' involves an *honest mistake* on the part of a party coupled with sufficient knowledge on the other party." *See also Howe*, 801 F.3d at 747 (emphasis added). Wharton's delayed disclosures involve no honest mistakes; in fact, they involve no mistakes at all. Nor did Plaintiffs have sufficient knowledge of what was coming beforehand. The party seeking to justify an exception to the exclusionary sanction has the burden to prove harmlessness. *Roberts*, 325 F.3d at 782. Defendant has failed to meet this burden.

### 5. Whether Wharton should be stricken as an expert witness

Finally, Plaintiffs make a perfunctory argument at the end of their brief in support of the motion to exclude Wharton's untimely opinion (ECF No. 53), seemingly as an afterthought, that Wharton should be excluded as an expert witness entirely because: (1) his initial and rebuttal reports fail to satisfy the requirements of Fed. R. Civ. P. 26(a)(2)(B); and (2) his "non-opinions" fail to satisfy Federal Rule of Evidence 702. (ECF No. 53, PageID.2141-2143.) With regard to Fed. R. Civ. P. 26(a)(2)(B) specifically, Plaintiffs assert that Wharton admitted in his expert disclosures and deposition that he had too little information to reach an opinion regarding causation, and that "[e]xpert reports must indicate how and why an expert reached a particular opinion," and "[a] mere recitation of

an expert's conclusory opinions will not satisfy Fed. R. Civ. P. 26(a)(2)(B)." (ECF No. 53, PageID.2141-2142.) And, pursuant to FRE 702, Plaintiffs contend that Wharton's "non-opinions" fail to satisfy FRE 702 because an expert's opinion must set forth facts and reasoning arising from a logical foundation, and "no jury would be helped by Wharton's testimony that he did not have sufficient information to render any opinions." (ECF No. 53, PageID.2141-2142.)

Defendant's response is equally perfunctory. Defendant contends that Wharton's opinions and testimony are admissible because they serve the purpose of rebutting Tognetti's alleged speculation regarding what occurred. (ECF No. 54, PageID.2385-2386.) Further, Defendant argues that Wharton satisfies the requirements of FRE 702 because he based his opinions on testimony and direct experimentation using Tognetti's data, and because his conclusion that Tognetti's opinions are not based on a reasonable degree of scientific certainty will help the jury to understand the lack of support for Tognetti's speculation regarding causation. (ECF No. 54, PageID.2385-2386.) In other words, Wharton is merely a rebuttal witness.

Plaintiffs seem to conflate Fed. R. Civ. P. 26(a)(2)(B) and FRE 702, but one governs expert witness' written reports, while the other involves the testimony of experts. I will address the arguments with regard to Rule 26 first.

### a. Rule 26

Rule 26(a)(2)(B) provides that an expert report must contain, in pertinent part, a complete statement of all opinions the witness will express and the basis for them, and the facts or data considered by the witness in forming them. Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). In support of its argument that Wharton's reports contained no opinions and, therefore, failed to satisfy Fed. R. Civ. P. 26(a)(2)(B), Plaintiffs cite *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010). (ECF No. 53, PageID.2141-2142.) There, the Court reasoned that to satisfy Rule 26(a)(2)(B), "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead, Inc.*, 606 F.3d at 271 (quotation marks and citation omitted).

Contrary to Plaintiffs' argument, Wharton did express opinions in his reports – most importantly that examination of the subject mirror, cleats, and room would be required to adequately opine on causation and check Tognetti's hypothesis. And the Court is unpersuaded by Plaintiffs' cursory arguments that Wharton failed to provide adequate support or explanation for the above opinion. Although, as stated above, Wharton was given every opportunity to inspect the mirror and room separately, and Tognetti did inspect both the mirror and room separately (Tognetti Dep. Trans., ECF No. 54-21, pp. 10, 58, PageID.2624, 2636.), a fact which alone may have rendered Wharton's opinion moot, Wharton emphasized in his rebuttal report that:

Forensic reconstruction of this accident and determination of
causation and responsibility still requires that the mirror and cleats
stored at the Travelers Lab be returned to Room 239 and that the
specific spatial relationships of the light fixture, the mirror and the
cleats be carefully examined and measured. There is no evidence in
the material reviewed to date that such an examination has been
performed by anyone.

(ECF No. 54-20, PageID.2612.) He also further explained that reasoning, stating:

Mr. Tognetti did not describe how the overlap between the ends of the
cleats would have been overcome to install the mirror. Mr. Tognetti's
hypothesis is based on his assumption that the light fixture was
installed before the mirror, which is contradicted by the testimony of
Mr. Wilson, who installed the mirror.

The caption to Photo 4 from the EFI Global (Izzo) report stated that
the cleat attached to the mirror had no evidence of damage or distress.
No such damage was evident in Figure 1 above. This observation
needs to be checked in order to support or disprove Mr. Tognetti's
hypothesis of the mechanism of the mirror falling on the piping.
Because the cleats are made of the same material, some corresponding
evidence of damage on the lower edge of the mirror cleat would be
expected in order to cause the noted damage on the top of the wall
cleat. The absence of such damage would suggest that the mirror
cleat currently in the Travelers Lab did not fall from the wall cleat.

(ECF No. 54-20, PageID.2612.)

The above opinion, along with the others listed by Wharton in his reports,

may not provide an explanation as to causation, but the language of Rule

26(a)(2)(B) does not contain such a requirement, and Plaintiffs provide no case law

to the contrary. Moreover, as Defendant points out in its response to Plaintiffs'

arguments (ECF No. 54, PageID.2385), the burden rests with Plaintiffs to prove

their negligence claim. *Billops v. Target Corp.*, No. 12-15395, 2014 WL 806850,

at *2 (E.D. Mich. Feb. 28, 2014) ("A plaintiff alleging negligence has 'the burden of producing evidence sufficient to make out a prima facie case.'") (citation omitted).  While Wharton may not have an opinion as to causation, he is not required to; however, he does have an opinion as to the inadequacies of Tognetti's method.

### b. FRE 702

Additionally, under FRE 702, an expert need not exclusively testify regarding his or her opinion.  FRE 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702 (emphasis added).  As stated in *Jesa Enterprises Ltd. V. Thermoflex Corp.*, 268 F. Supp. 3d 968, 973-74 (E.D. Mich. 2017), a case cited by Plaintiffs in support of their arguments, "Rule 702 allows an expert to 'testify in the form of an opinion *or otherwise*' (emphasis added), which means that the expert may share his

or her special knowledge with the jury in areas that might extend beyond the information known to the average juror[,]" and "[w]hen an expert's testimony does not take the form of an opinion, but rather focuses on 'educat[ing] the factfinder on general principles,' application of the foundational elements of Rule 702 takes on a different cast." Plaintiffs fail to address this principle. Further, Plaintiffs' assertion, with no meaningful explanation whatsoever, that "no jury would be helped by Wharton's testimony that he did not have sufficient information to render any opinions" (ECF No. 53, PageID.2142) is cursory at best. The Court sees no reason to make the argument, or provide any detailed analysis, for them. Plaintiffs do not make a developed challenge to Wharton's "knowledge, skill, experience or training," and he does appear to possess specialized knowledge "in areas that might extend beyond the information known to the average juror."

Accordingly, the Court will not entirely exclude Wharton's report and rebuttal report, and will allow his testimony at trial, subject of course to Plaintiffs' cross-examination. He may testify as to his criticisms of Tognetti's methods, opine that causation cannot be determined or is "premature[,]" if he still believes that to be true, and explain what is or would be required in order to determine causation. (*See* ECF No. 53-16, PageID.2276.) However, he may not testify regarding his untimely opinion regarding possibility/impossibility or the sequence of the mirror and light fixture installation, give his own opinion as to causation, or

present or discuss his mockup or a "re-creation[,]" as described in extensive detail above. He is also precluded from rendering his proposed opinions that: (1) "information provided to date has provided conflicting information about the condition of the bathroom and especially the mirror when the water leak was discovered[;]" (2) "[t]here is still no explanation for the sudden appearance of furniture in Room 239 on the morning when the piping leak was discovered[;]" (3) "[t]here is still no explanation for the vanity seen outside Room 239 on the morning when the piping leak was discovered " or from suggesting, as he vaguely does in his "summary of opinions," that he may, at some future date, review "witness testimony and examin[e]… the mirror" and then "resolve the conflicting information." (ECF No. 53-16, PageID.2276; ECF No. 54-20, PageID.2613; ECF No. 53-17, PageID.2303.) These "opinions," if they merit that description, are purely argumentative, seek to weigh facts for the jury and invade its province, require no specialized scientific, educational or experiential knowledge under FRE 702, and are not rendered as a lay witness based on "the witness's perception." FRE 701(a); *see* 1972 Advisory Committee Notes ("Limitation (a) is the familiar requirement of first-hand knowledge or observation.").

   **IT IS SO ORDERED.**

Dated: March 30, 2020

_____

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE